Mr. John Castro
Appeal of Intent to Revoke
Page 13

      RESPONSE: DEQ was aware that the CUC laboratory was sampling these sites. The CUC laboratory proposed a revised sampling plan which included this site; however, DEQ took no action on the proposed plan. Therefore, ID #32 was not included in the DEQ approved sampling plan. Sites not in the sampling plan are not required to be reported. CNMI Drinking Water Regulations §§ 5.3.2(a) & 7.2. DEQ cannot base decertification on failing to report results that were not required to be reported.

38.    October 2, 2001 - ID #5 was reported to DEQ as negative for bacteria on the chlorine residual recheck sheet, but the sample was never analyzed for bacteria.

      RESPONSE: Routine monitoring results for ID #5 were negative for bacteria; therefore, no repeat sampling was required, and the sampling site was deemed negative for bacteria for that round of sampling. CNMI Drinking Water Regulations § 5.3.2(b). Further there was no requirement for chlorine residual recheck under the regulations. CNMI Drinking Water Regulations § 10.4. DEQ cannot base decertification on reporting that was not required. Also, the report accurately reflected that the site was deemed negative for bacteria as a result of the routine sampling.

39.    October 18, 2001 - Sampling results for IDs #40, 51A and 51B were not reported to DEQ.

      RESPONSE: DEQ was aware that the CUC laboratory was sampling these sites. The CUC laboratory proposed a revised sampling plan which included these sites; however, DEQ took no action on the proposed plan. Therefore, IDs #40, 51A, and 51B were not included in the DEQ approved sampling plan. Sites not in the sampling plan are not required to be reported. CNMI Drinking Water Regulations §§ 5.3.2(a) & 7.2. DEQ cannot base decertification on failing to report results that were not required to be reported.

40.    October 25, 2001 - Sampling results for ID #53A were not reported to DEQ.

      RESPONSE: DEQ was aware that the CUC laboratory was sampling this site. The CUC laboratory proposed a revised sampling plan which included this site; however, DEQ took no action on the proposed plan. Therefore, ID #53A was not included in the DEQ approved sampling plan. Sites not in the sampling plan are not required to be reported. CNMI Drinking Water Regulations §§ 5.3.2(a) & 7.2. DEQ cannot base decertification on failing to report results that were not required to be reported.

41.    November 2, 2001 - Testing results for ID #10 were coliform positive, but were reported to DEQ as coliform negative.

      RESPONSE: This is simply an error in transcribing the results from the raw data sheets to the reports. This type of human error is to be expected occasionally and it occurred at the

Mr. John Castro
Appeal of Intent to Revoke
Page 14

CUC laboratory very rarely. It only occurred six (6) times in transcribing over three-thousand (3,000) results or about 0.2% of the time. DEQ cannot base decertification on human error that occurs this infrequently. Because the routine samples were reported as negative, the repeat samples were not reported. CNMI Drinking Water Regulations §§ 5.3.2 & 7.2.

42.     November 2, 2001 - Sampling results for IDs #42 and 53 were not reported to DEQ.

RESPONSE:  DEQ was aware that the CUC laboratory was sampling these sites. The CUC laboratory proposed a revised sampling plan which included these sites; however, DEQ took no action on the proposed plan. Therefore, IDs #42 and 53 were not included in the DEQ approved sampling plan. Sites not in the sampling plan are not required to be reported. CNMI Drinking Water Regulations §§ 5.3.2(a) & 7.2. DEQ cannot base decertification on failing to report results that were not required to be reported.

43.     November 15, 2001 - The raw data for bacteria analysis is missing.

RESPONSE:  The CUC laboratory's recordkeeping is almost entirely flawless, with the exception of a few isolated instances where some of the raw data has been misplaced. DEQ implies that the missing data indicates that the samples were not analyzed. This is not true. The CUC laboratory's run logs, which have been reviewed, indicated that the samples were in fact run. DEQ cannot base decertification on a few isolated instances where lab sheets have been misplaced, but the tests have actually been performed.

44.     November 19, 2001 - The raw data for bacteria analysis is missing.

RESPONSE:  The CUC laboratory's recordkeeping is almost entirely flawless, with the exception of a few isolated instances where some of the raw data has been misplaced. DEQ implies that the missing data indicates that the samples were not analyzed. This is not true. The CUC laboratory's run logs, which have been reviewed, indicated that the samples were in fact run. DEQ cannot base decertification on a few isolated instances where lab sheets have been misplaced, but the tests have actually been performed.

45.     December 27, 2001 - Sampling results for IDs #29, 29A, 29B, 49, 49A, and 49B were not reported to DEQ.

RESPONSE:  DEQ was aware that the CUC laboratory was sampling these sites. The CUC laboratory proposed a revised sampling plan which included these sites; however, DEQ took no action on the proposed plan. Therefore, IDs #29, 29A, 29B, 49, 49A, and 49B were not included in the DEQ approved sampling plan. Sites not in the sampling plan are not required to be reported. CNMI Drinking Water Regulations §§ 5.3.2(a) & 7.2. DEQ cannot base decertification on failing to report results that were not required to be reported.

Mr. John Castro
Appeal of Intent to Revoke
Page 15

46. January 3, 2002 - ID #10 was reported to DEQ as negative for bacteria on the chlorine residual recheck sheet, but the sample was never analyzed for bacteria.

   RESPONSE: Routine monitoring results for ID #10 were negative for bacteria; therefore, no repeat sampling was required, and the sampling site was deemed negative for bacteria for that round of sampling. CNMI Drinking Water Regulations § 5.3.2(b). Further there was no requirement for chlorine residual recheck under the regulations. CNMI Drinking Water Regulations § 10.4. DEQ cannot base decertification on reporting that was not required. Also, the report accurately reflected that the site was deemed negative for bacteria as a result of the routine sampling.

47. April 4, 2002 - ID #46B was reported as negative, but data indicates that it is positive.

   RESPONSE: Routine monitoring results for ID #46 were negative for bacteria; therefore, no repeat sampling was required, and the sampling site was deemed negative for bacteria for that round of sampling. CNMI Drinking Water Regulations § 5.3.2(b). Further there was no requirement for chlorine residual recheck under the regulations. CNMI Drinking Water Regulations § 10.4. DEQ cannot base decertification on reporting that was not required. Also, the report accurately reflected that the site was deemed negative for bacteria as a result of the routine sampling.

48. April 11, 2002 - IDs #19 and 19B were reported to DEQ as negative for bacteria on the chlorine residual recheck sheet, but the samples were never analyzed for bacteria.

   RESPONSE: Routine monitoring results for ID #19 were negative for bacteria; therefore, no repeat sampling was required, and the sampling site was deemed negative for bacteria for that round of sampling. CNMI Drinking Water Regulations § 5.3.2(b). Further there was no requirement for chlorine residual recheck under the regulations. CNMI Drinking Water Regulations § 10.4. DEQ cannot base decertification on reporting that was not required. Also, the report accurately reflected that the site was deemed negative for bacteria as a result of the routine sampling.

49. May 23, 2002 - IDs #4A, 4B, 3A, 3B, 15A, 15B, 19A, and 15B were not analyzed for bacteria on May 24, 2002.

   RESPONSE: Routine monitoring results for IDs #4, 15 and 19 were negative for bacteria; therefore, no repeat sampling was required, and the sampling site was deemed negative for bacteria for that round of sampling. CNMI Drinking Water Regulations § 5.3.2(b). DEQ cannot base decertification failure to conduct analysis that was not required. The report accurately reflected that the site was deemed negative for bacteria as a result of the routine sampling. The routine sample for ID #3 was positive, so repeat samples were taken on May 23, 2002 and reported to DEQ. Repeat samples were also taken for ID #3 on May 24, 2002 and were

Mr. John Castro
Appeal of Intent to Revoke
Page 16

accurately reported to DEQ. Although the raw data for the May 24, 2002 sampling is missing, the laboratory personnel specifically remember taking this repeat sample.

50. June 20, 2002 - IDs # 1, 1A, 1B, 45, 45A, and 45B were not analyzed on June 21, 2002, but on June 22, 2002.

    RESPONSE: Routine monitoring results for IDs #1 and 45 were negative for bacteria; therefore, no repeat sampling was required, and the sampling site was deemed negative for bacteria for that round of sampling. CNMI Drinking Water Regulations § 5.3.2(b). Further there was no requirement for chlorine residual recheck under the regulations. CNMI Drinking Water Regulations § 10.4. DEQ cannot base decertification on reporting that was not required. Also, the report accurately reflected that the site was deemed negative for bacteria as a result of the routine sampling.

51. July 3, 2002 - IDs #46, 46A and 46B were reported to DEQ as negative for bacteria on the chlorine residual recheck sheet, but the samples were never analyzed for bacteria.

    RESPONSE: Routine monitoring results for ID #46 were negative for bacteria; therefore, no repeat sampling was required, and the sampling site was deemed negative for bacteria for that round of sampling. CNMI Drinking Water Regulations § 5.3.2(b). Further there was no requirement for chlorine residual recheck under the regulations. CNMI Drinking Water Regulations § 10.4. DEQ cannot base decertification on reporting that was not required. Also, the report accurately reflected that the site was deemed negative for bacteria as a result of the routine sampling.

52. July 10, 2002 - IDs #9, 9A and 9B were reported to DEQ as negative for bacteria on the chlorine residual recheck sheet, but the samples were never analyzed for bacteria.

    RESPONSE: Routine monitoring results for ID #9 were negative for bacteria; therefore, no repeat sampling was required, and the sampling site was deemed negative for bacteria for that round of sampling. CNMI Drinking Water Regulations § 5.3.2(b). Further there was no requirement for chlorine residual recheck under the regulations. CNMI Drinking Water Regulations § 10.4. DEQ cannot base decertification on reporting that was not required. Also, the report accurately reflected that the site was deemed negative for bacteria as a result of the routine sampling.

53. July 10, 2002 - IDs # 9 and 19 were reported as negative, but the raw data indicates that the results were positive.

    RESPONSE: The raw data results were originally marked as positive because there appeared to be a small strand of coliform in the sample, although it was not clear. After the sample was given additional time in the incubator, and the sample was observed under an

Mr. John Castro
Appeal of Intent to Revoke
Page 17

ultraviolet light, it became clear that the sample was negative. The result was changed to reflect a negative result. Thus, the reporting in this instance is accurate and provides no basis for a DEQ objection.

54.   August 8, 2002 - Sampling results for IDs #34, 34A and 34B were not reported to DEQ.

   RESPONSE:   DEQ was aware that the CUC laboratory was sampling these sites. The CUC laboratory proposed a revised sampling plan which included this site; however, DEQ took no action on the proposed plan. Therefore, IDs #34, 34A, and 34B were not included in the DEQ approved sampling plan. Sites not in the sampling plan are not required to be reported. CNMI Drinking Water Regulations §§ 5.3.2(a) & 7.2. DEQ cannot base decertification on failing to report results that were not required to be reported.

55.   August 22, 2002 - Sampling for this date was all negative, but was not reported to DEQ.

   RESPONSE:   DEQ's sampling plan requires that 84 samples be taken and reported per month (i.e. 21 sites per week). The sampling event that DEQ is referring to was for internal purposes and was in addition to the samples that the CUC laboratory is required to take and report to DEQ. The CNMI Drinking Water Regulations do not prohibit CUC laboratory from taking these extra samples, and there is no requirement in the regulations that CUC laboratory report the sample results to DEQ. DEQ cannot base decertification on the non-reporting of these samples.

56.   August 29, 2002 - Sampling results for IDs #53, 53A and 53B were not reported to DEQ.

   RESPONSE:   DEQ was aware that the CUC laboratory was sampling these sites. The CUC laboratory proposed a revised sampling plan which included this site; however, DEQ took no action on the proposed plan. Therefore, IDs #53, 53A, and 53B were not included in the DEQ approved sampling plan. Sites not in the sampling plan are not required to be reported. CNMI Drinking Water Regulations §§ 5.3.2(a) & 7.2. DEQ cannot base decertification on failing to report results that were not required to be reported.

57.   September 5, 2002 - IDs # 12I, 12A, 12B, 13I, 13A, 13B, 21I, 21A, 21B, 45, 45I, 45A, and 45B were reported to DEQ as negative for bacteria, but the samples were never analyzed for bacteria.

   RESPONSE:   The samples were analyzed for bacteria, and this is set forth in the raw data package.

58.   September 26, 2002 - ID #8 was reported as negative, but was not analyzed.

   RESPONSE:   This is simply an error in transcribing the results from the raw data sheets

Mr. John Castro
Appeal of Intent to Revoke
Page 18

to the reports. This type of human error is to be expected occasionally and it occurred at the CUC laboratory very rarely. It only occurred six (6) times in transcribing over three-thousand (3,000) results or about 0.2% of the time. DEQ cannot base decertification on human error that occurs this infrequently.

59.    October 3, 2002 - The raw data for bacteria analysis is missing.

RESPONSE: The CUC laboratory's recordkeeping is almost entirely flawless, with the exception of a few isolated instances where some of the raw data has been misplaced. DEQ implies that the missing data indicates that the samples were not analyzed. This is not true. The CUC laboratory's run logs, which have been reviewed, indicated that the samples were in fact run. DEQ cannot base decertification on a few isolated instances where lab sheets have been misplaced, but the tests have actually been performed.

60.    October 10, 2002 - Sampling results for ID #51 were not reported to DEQ.

RESPONSE: DEQ was aware that the CUC laboratory was sampling this site. The CUC laboratory proposed a revised sampling plan which included this site; however, DEQ took no action on the proposed plan. Therefore, ID #51 was not included in the DEQ approved sampling plan. Sites not in the sampling plan are not required to be reported. CNMI Drinking Water Regulations §§ 5.3.2(a) & 7.2. DEQ cannot base decertification on failing to report results that were not required to be reported.

61.    October 17, 2002 - The raw data for bacteria analysis is missing.

RESPONSE: The CUC laboratory's recordkeeping is almost entirely flawless, with the exception of a few isolated instances where some of the raw data has been misplaced. DEQ implies that the missing data indicates that the samples were not analyzed. This is not true. The CUC laboratory's run logs, which have been reviewed, indicated that the samples were in fact run. DEQ cannot base decertification on a few isolated instances where lab sheets have been misplaced, but the tests have actually been performed.

62.    October 31, 2002 - The raw data for bacteria analysis is missing.

RESPONSE: The CUC laboratory's recordkeeping is almost entirely flawless, with the exception of a few isolated instances where some of the raw data has been misplaced. DEQ implies that the missing data indicates that the samples were not analyzed. This is not true. The CUC laboratory's run logs, which have been reviewed, indicated that the samples were in fact run. DEQ cannot base decertification on a few isolated instances where lab sheets have been misplaced, but the tests have actually been performed.

63.    November 7, 2002 - IDs #46, 46A and 46B were reported to DEQ as negative for bacteria

Mr. John Castro
Appeal of Intent to Revoke
Page 19

on the chlorine residual recheck sheet, but the samples were never analyzed for bacteria.

    RESPONSE: Routine monitoring results for ID #46 were negative for bacteria; therefore, no repeat sampling was required, and the sampling site was deemed negative for bacteria for that round of sampling. CNMI Drinking Water Regulations § 5.3.2(b). Further there was no requirement for chlorine residual recheck under the regulations. CNMI Drinking Water Regulations § 10.4. DEQ cannot base decertification on reporting that was not required. Also, the report accurately reflected that the site was deemed negative for bacteria as a result of the routine sampling.

64.    November 14, 2002 - Results of tests conducted on November 14, 2002 were not reported to DEQ.

    RESPONSE: DEQ's sampling plan requires that 84 samples be taken and reported per month (i.e. 21 sites per week). The sampling event that DEQ is referring to was for internal purposes and was in addition to the samples that the CUC laboratory is required to take and report to DEQ. The CNMI Drinking Water Regulations do not prohibit CUC laboratory from taking these extra samples, and there is no requirement in the regulations that CUC laboratory report the sample results to DEQ. DEQ cannot base decertification on the non-reporting of these samples.

65.    December 5, 2002 - The raw data for bacteria is missing.

    RESPONSE: The CUC laboratory's recordkeeping is almost entirely flawless, with the exception of a few isolated instances where some of the raw data has been misplaced. DEQ implies that the missing data indicates that the samples were not analyzed. This is not true. The CUC laboratory's run logs, which have been reviewed, indicated that the samples were in fact run. DEQ cannot base decertification on a few isolated instances where lab sheets have been misplaced, but the tests have actually been performed.

66.    December 5, 2002 - IDs #12, 12I, 12A, 12B, 12A-1, 12A-2, 12B-1, 12B-2, 21I, 21A, 21B, 21A-1, 21A-2, 21B-1, 21B-2, 13I, 13A, 13B, 13A-1, 13A-2, 13B-1, 13B-2, 46I, 46A, and 46B were reported to DEQ as negative for bacteria on the chlorine residual recheck sheet, but the samples were never analyzed for bacteria.

    RESPONSE: Routine monitoring results for IDs #12, 21, 13, and 46 were negative for bacteria; therefore, no repeat sampling was required, and the sampling sites were deemed negative for bacteria for that round of sampling. CNMI Drinking Water Regulations § 5.3.2(b). Further there was no requirement for chlorine residual recheck under the regulations. CNMI Drinking Water Regulations § 10.4. DEQ cannot base decertification on reporting that was not required. Also, the report accurately reflected that the sites were deemed negative for bacteria as a result of the routine sampling.

Mr. John Castro
Appeal of Intent to Revoke
Page 20

67. DECEMBER 10, 2002 - IDs # 5I, 5A and 5B were reported negative on December 10, 2002, but there is no data to support the results. On December 11, 2002, the same sites were reported as negative, but there is no data to support the results.

    RESPONSE: The CUC laboratory has located the raw data for the December 10, 2002. Because the results of December 10, 2002 were negative, no additional testing was required. CNMI Drinking Water Regulations § 5.3.2(b). The CUC laboratory also has the raw data for December 11, 2002. The samples were not analyzed for bacteria because it was not required. DEQ cannot base decertification on reporting that was not required.

68. DECEMBER 19, 2002 - ID #38B was not reported.

    RESPONSE: DEQ was aware that the CUC laboratory was sampling this site. The CUC laboratory proposed a revised sampling plan which included this site; however, DEQ took no action on the proposed plan. Therefore, ID #38B was not included in the DEQ approved sampling plan. Sites not in the sampling plan are not required to be reported. CNMI Drinking Water Regulations §§ 5.3.2(a) & 7.2. DEQ cannot base decertification on failing to report results that were not required to be reported.

69. December 27, 2002 - IDs #6I and 9I were reported to DEQ as negative for bacteria on the chlorine residual recheck sheet, but the samples were never analyzed for bacteria.

    RESPONSE: Routine monitoring results for IDs #6 and 9 were negative for bacteria; therefore, no repeat sampling was required, and the sampling sites were deemed negative for bacteria for that round of sampling. CNMI Drinking Water Regulations § 5.3.2(b). Further there was no requirement for chlorine residual recheck under the regulations. CNMI Drinking Water Regulations § 10.4. DEQ cannot base decertification on reporting that was not required. Also, the report accurately reflected that the sites were deemed negative for bacteria as a result of the routine sampling.

70. February 13, 2003 - IDs # 24, 24I, 24A, 40, 40I, 40A, 40B and 38B were not reported to DEQ.

    RESPONSE: DEQ was aware that the CUC laboratory was sampling these sites. The CUC laboratory proposed a revised sampling plan which included this site; however, DEQ took no action on the proposed plan. Therefore, IDs #24, 24I, 24A, 40, 40I, 40A, 40B and 38B were not included in the DEQ approved sampling plan. Sites not in the sampling plan are not required to be reported. CNMI Drinking Water Regulations §§ 5.3.2(a) & 7.2. DEQ cannot base decertification on failing to report results that were not required to be reported.

71. February 13, 2002 - IDs #10, 12, and 19 were reported to DEQ as negative for bacteria on the chlorine residual recheck sheet, but the samples were never analyzed for bacteria.

Mr. John Castro
Appeal of Intent to Revoke
Page 21

  RESPONSE: Routine monitoring results for IDs #10, 12 and 19 were negative for bacteria; therefore, no repeat sampling was required, and the sampling sites were deemed negative for bacteria for that round of sampling. CNMI Drinking Water Regulations § 5.3.2(b). Further there was no requirement for chlorine residual recheck under the regulations. CNMI Drinking Water Regulations § 10.4. DEQ cannot base decertification on reporting that was not required. Also, the report accurately reflected that the sites were deemed negative for bacteria as a result of the routine sampling.

72. February 20, 2002 - IDs #12, 12A and 12B were reported to DEQ as negative for bacteria on the chlorine residual recheck sheet, but the samples were never analyzed for bacteria.

  RESPONSE: Routine monitoring results for IDs #12 were negative for bacteria; therefore, no repeat sampling was required, and the sampling site was deemed negative for bacteria for that round of sampling. CNMI Drinking Water Regulations § 5.3.2(b). Further there was no requirement for chlorine residual recheck under the regulations. CNMI Drinking Water Regulations § 10.4. DEQ cannot base decertification on reporting that was not required. Also, the report accurately reflected that the site was deemed negative for bacteria as a result of the routine sampling.

73. February 27, 2003 - Results of testing done on February 27, 2003 were not reported to DEQ. There is no CUC laboratory data to support the February 28, 2003 report.

  RESPONSE: The results of February 27, 2003 were reported in the report that was inadvertently dated February 28, 2003.

74. February 27, 2003 - IDs # 20I, 20A, 20B, 12I, 12A, 12B, 21I, 21A, 21B, 13I, 13A, 13B, 46I, 46A, 46B, 15I, 15A, 15B, 47I, 47A, 47B, and 19I were not reported to DEQ.

  RESPONSE: Routine monitoring results for IDs #20, 12, 21, 13, 46, 15, 47, and 19 were negative for bacteria; therefore, no repeat sampling was required, and the sampling site was deemed negative for bacteria for that round of sampling. CNMI Drinking Water Regulations § 5.3.2(b). DEQ cannot base decertification on reporting that was not required.

75. February 28, 2003 - February 20, 2002 - IDs #20, 20A and 20B were reported to DEQ as negative for bacteria on the chlorine residual recheck sheet, but the samples were never analyzed for bacteria.

  RESPONSE: Routine monitoring results for IDs #20 were negative for bacteria; therefore, no repeat sampling was required, and the sampling site was deemed negative for bacteria for that round of sampling. CNMI Drinking Water Regulations § 5.3.2(b). Further there was no requirement for chlorine residual recheck under the regulations. CNMI Drinking Water Regulations § 10.4. DEQ cannot base decertification on reporting that was not required. Also,

Mr. John Castro
Appeal of Intent to Revoke
Page 22

the report accurately reflected that the site was deemed negative for bacteria as a result of the routine sampling.

76.   May 2, 2003 - February 20, 2002 - IDs #15, 15A and 15B were reported to DEQ as negative for bacteria on the chlorine residual recheck sheet, but the samples were never analyzed for bacteria.

   RESPONSE:   Routine monitoring results for IDs #15 were negative for bacteria; therefore, no repeat sampling was required, and the sampling site was deemed negative for bacteria for that round of sampling. CNMI Drinking Water Regulations § 5.3.2(b). Further there was no requirement for chlorine residual recheck under the regulations. CNMI Drinking Water Regulations § 10.4. DEQ cannot base decertification on reporting that was not required. Also, the report accurately reflected that the site was deemed negative for bacteria as a result of the routine sampling.

77.   May 22, 2003 - February 20, 2002 - The results of the upstream/downstream testing were reported to DEQ as negative for bacteria on the chlorine residual recheck sheet, but the samples were never analyzed for bacteria.

   RESPONSE:   Routine monitoring results for all sample locations were negative for bacteria; therefore, no repeat sampling was required, and all of the sampling sites were deemed negative for bacteria for that round of sampling. CNMI Drinking Water Regulations § 5.3.2(b). Further there was no requirement for chlorine residual recheck under the regulations. CNMI Drinking Water Regulations § 10.4. DEQ cannot base decertification on reporting that was not required. Also, the report accurately reflected that all of the sites were deemed negative for bacteria as a result of the routine sampling.

78.   May 29, 2003 - The results of the upstream/downstream testing were reported to DEQ as negative for bacteria on the chlorine residual recheck sheet, but the samples were never analyzed for bacteria.

   RESPONSE:   Routine monitoring results for all sample locations were negative for bacteria; therefore, no repeat sampling was required, and all of the sampling sites was deemed negative for bacteria for that round of sampling. CNMI Drinking Water Regulations § 5.3.2(b). Further there was no requirement for chlorine residual recheck under the regulations. CNMI Drinking Water Regulations § 10.4. DEQ cannot base decertification on reporting that was not required. Also, the report accurately reflected that all of the sites were deemed negative for bacteria as a result of the routine sampling.

## CONCLUSION

   DEQ's basis for decertification is that the CUC laboratory allegedly falsified reports and

Mr. John Castro
Appeal of Intent to Revoke
Page 23

engaged in deceptive practices. As set forth above, the facts do not support that the CUC laboratory engaged in such behavior. Rather, the evidence shows that the CUC laboratory was in compliance with the coliform reporting and sampling regulations, accurately reported information, frequently reported more information than was required, and often took actions which exceeded regulatory standards to further protect human health. In addition, the CUC laboratory personnel are highly qualified, experienced, hard working, and conscientious. Therefore, there is no basis for decertification.

  While the CUC disputes the DEQ's findings, the CUC has continued to work with the DEQ to resolve what DEQ perceives to be problematic. For example, the CUC laboratory and DEQ have recently revised the sampling plan to include additional sites, which are currently being reported to DEQ. The CUC laboratory has also recalculated compliance based on new criteria provided by DEQ, and has provided public notices where appropriate. The CUC remains willing to discuss further measures that could be taken by the laboratory to address additional concerns that the DEQ may have. Please call Ms. Laura Mangloña, (670) 235-7025, at your earliest convenience to discuss this matter.

Sincerely,

Mark E. Freeze
D.J. Tyler
Attorneys for the CUC

Pedro Q. Babauta
CUC Laboratory Supervisor

cc: Ms. Clarissa Bearden, DEQ Laboratory Certification Officer c/o Laura I. Mangloña

| | |
|---|---|
| United States Environmental Protection Agency<br>Criminal Investigation Division | 0905-0043<br>Case Number |

## Investigative Activity Report

| | |
|---|---|
| Case Title:<br>Commonwealth Utilities Corporation (CUC) | Reporting Office:<br>San Francisco |

Subject of Report:
Phone conversation with Mariano IGLECIAS on September 3, 2003

Copies to:                                                                 Related Files:

| Reporting Official and Date: | Approving Official and Date: |
|---|---|
| Gary W. Guerra, SA | Richard S. West, SAC |

### DETAILS

On September 3, 2003, Special Agent Gary GUERRA (EPA-CID) received a call from Mariano IGLECIAS from his residence. SA GUERRA returned the call to IGLECIAS who is a current employee of Commonwealth Utilities Commission (CUC).

IGLECIAS said he called because the CUC suspended him (with pay) from his job at the CUC Water Quality Lab. IGLECIAS felt that this constituted "harassment" as he felt "forced" into signing documents placed in front of him at the end of yesterday by the CUC Human Resources Manager (Frank CEPEDA). IGLECIAS indicated that he was very upset and was contemplating getting a lawyer to look out for his and his family's best interest. IGLECIAS provided the following information:

### Recent Activity:

IGLECIAS noted that on August 11, 2003, he and the rest of the Lab staff had to do a lot of "bate-stamping" of lab documents in response to a subpoena.

IGLECIAS stated that on August 29, 2003, lawyers (FREESE & TYLER) from TestLaw came to the lab to talk to him again about the DEQ's allegations of reports being falsified. IGLECIAS said that he affirmed that documents were being falsified. IGLECIAS said he told them that he was very uncomfortable talking about this at the office as everyone could hear, especially his supervisor (Pete BABAUTA) whom he had identified as being the person responsible for the falsifications. IGLECIAS said that this in mind, the interview was terminated and rescheduled for Sunday afternoon at his home.

On August 31, 2003, the interview was continued as planned and IGLECIAS stated that like before, no notes were taken by

This document contains neither recommendations nor conclusions of the EPA.
It is the property of the EPA and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

OCE Form 008 (3/98)          Original-Case File  Copy-SAC Office Copy-HQ          Page 1 of 5

JEN00025

United States Environmental Protection Agency  
Criminal Investigation Division

0905-0043  
Case Number

## Investigative Activity Report

anyone and noted that TestLaw did not ask any specific questions like "we" did when we interviewed him a month ago. IGLECIAS said they mainly asked about the "process" by which the monthly reports were created. IGLECIAS said he told them how he filled in a blank form utilizing raw data sheets and then gave it to the administrative person (Joyce FEJERAN-CASTRO) so she could type it up and then give it back to him so he could review it for accuracy before giving to his supervisor (BABAUTA).

IGLECIAS commented that the first time TestLaw questioned him in response to the DEQ's initial allegations in June 2003, TestLaw mainly looked at documents in trying to respond to the DEQ's "revocation letter." IGLECIAS noted that TestLaw did not ask many questions and when they did, not the "correct" ones. IGLECIAS said that he was tempted to tell them that their written response to DEQ stating that it was a "transcription error," was simply not true....but he did not.

Falsification of Drinking Water Sample Data:

IGLECIAS recalled that between late 2000 and the end of 2002, he recalled five (5) instances where BABAUTA called him into his office to discuss the results of drinking water sampling data and how reporting the actual results to DEQ would cause problems for the CUC as it would cause them to violate their permitted allowances per the CNMI Drinking Water Regulations (i.e., >5% of MCL).

IGLECIAS stated that BABAUTA would ask him "what do you think?" IGLECIAS said BABAUTA would talk about the CUC Water Division by saying that the "chlorinators" were not doing their job...and "let's help water." IGLECIAS indicated that BABAUTA would draw a line through a sample result if it showed a positive (+) result for TC, EC &/or FC and then write out to the right side of the actual result, a negative sign (-). IGLECIAS noted that he recalled BABAUTA using a red pen, as it always stood out.

IGLECIAS recalled that these changes would then go to FEJERAN-CASTRO and she would "just do it." IGLECIAS did not believe FEJERAN-CASTRO fully understood what all the lab results really meant and doubted that she would have challenged or questioned BABAUTA's instructions. IGLECIAS said he never told FEJERAN-CASTRO at the time about how BABAUTA had been altering the results. However, when he finally did admit this activity to her and another co-worker (Vinson SABLAN) earlier this year (2003), FEJERAN-CASTRO was "shocked" and SABLAN was "livid."

This document contains neither recommendations nor conclusions of the EPA. It is the property of the EPA and is loaned to your agency; it and its contents are not to be distributed outside your agency.

OCE Form 008 (3/98)   Original-Case File Copy-SAC Office Copy-HQ   Page 2 of 5

JEN00026

United States Environmental Protection Agency          0905-0043
Criminal Investigation Division                         Case Number

# Investigative Activity Report

Investigation by the CUC Board:

On the morning of September 2, 2003, IGLECIAS said the BABAUTA called him into his office. IGLECIAS said that he sat down and recalled BABAUTA telling him that the "DEQ is at it again" and that John CASTRO (DEQ Director) wanted to pursue this further and thought something would materialize. BABAUTA further commented that CASTRO's motives seemed to be aimed at getting the CUC's Lab decertified. BABAUTA queried if IGLECIAS had read the paper as there were articles reflecting his comments. IGLECIAS said he was not up to speed on all the local news involving their lab & the DEQ.

IGLECIAS said that BABAUTA stated that he had heard that the CUC Board members were telling his wife (Lorraine BABAUTA) that there was "new" information. IGLECIAS said that as BABAUTA is telling him this, he is presuming this "new" information was coming from his talks with the TestLaw attorneys. IGLECIAS said that at this point BABAUTA asked him directly if he knew what "triggered" this and then asked him if any investigators had come to his house. IGLECIAS said that before he could respond, BABAUTA took a phone call after which he told IGLECIAS that the Board wanted to question him.

IGLECIAS said that BABAUTA stated, "you know, we're in this together, we can just tell them (the Board) the same thing....it was just an error, human error." IGLECIAS said he presumed that BABAUTA meant this with regard to the changing of the positives to negatives on the monthly reports.

IGLECIAS said that as BABAUTA was telling him this, he realized that BABAUTA was asking him to lie to the Board about what really happened and was trying to make it seem as though he (IGLECIAS) as responsible as BABAUTA was....as if they had some type of agreement. IGLECIAS said that as telling him this, IGLECIAS was telling himself....how "dare" he ask him to lie and put him in that position. IGLECIAS said that when BABAUTA stood up to leave, he would not look BABAUTA in the eye as BABAUTA extended his had to shake on it. IGLECIAS said he intentionally did not look BABAUTA in the eye as it would have symbolized "sincerity" combined with the handshake.

IGLECIAS said that after BABAUTA left, he was nervous and pacing around and looking out the window for BABAUTA to return. BABAUTA said he actually thought that after BABAUTA was questioned by the CUC Board, he might find out that it was him

This document contains neither recommendations nor conclusions of the EPA.
It is the property of the EPA and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

OCE Form 008 (3/98)       Original-Case File  Copy-SAC Office  Copy-HQ         Page 3 of 5

JEN00027

United States Environmental Protection Agency
Criminal Investigation Division

0905-0043
Case Number

## Investigative Activity Report

(IGLECIAS) that had revealed the whole truth and BABAUTA would take some form of retaliation. IGLECIAS stated he knew BABAUTA owned four (4) rifles and that he thought he might come back to the office and shoot everyone. IGLECIAS said felt chest pains and was very "jumpy." IGLECIAS said that while he expressed his concerns to his co-worker (SABLAN), SABLAN did not seem concerned and commented that he did not believe BABAUTA would go get a gun. IGLECIAS said that only a new co-worker (Julia LNU) was present, but was not paying attention. IGLECIAS noted that the other two lab staff members were out of the office at the time.

Around 4:15pm the same day, IGLECIAS said he was called before the CUC Board and was asked 1) what he told the Special Agent, and 2) what was going on at the lab. IGLECIAS said he basically told a less-detailed version of our August 5th interview, but felt he was clear about the deceptive activity that had gone on since 2000 and the participants. IGLECIAS also told the Board that he had met with the Executive Director (Lorraine BABAUTA) on June 18, 2003, and advised her of the same. IGLECIAS stated that the Board told him that advising the Executive Director was the "best thing" he could have done, however, he would still bear the "burden" for his actions prior to revealing the whole truth to the Executive Director. IGLECIAS said that the Board told him they'd make their decision and let him know. IGLECIAS commented that he was very nervous and while never asked, forgot to tell them that he "feared" BABAUTA and that he never changed any of the raw data as BABAUTA requested him to do.

General Comments:

IGLECIAS indicated that another reason he decided not to "squeal" or blow the whistle on BABAUTA's actions to the Executive Director at the time (Tim VILLAGOMEZ), was because he did not think VILLAGOMEZ would do anything to BABAUTA since they were golfing buddies. IGLECIAS added that there was a group of administrators (5 men & 2 women) that always played golf together. IGLECIAS noted that BABAUTA played golf was part of this group and played during the work day at least once a week. IGLECIAS said he knew this because a friend of his works at a local course and saw these people show up to play.

IGLECIAS said that after BABAUTA's interview on August 8, 2003, with SA GUERRA and Inspector SEMAN.....and after the rest of the Lab staff had gone, BABAUTA broke down and cried in his office and told him that he thought he might be going to

This document contains neither recommendations nor conclusions of the EPA.
It is the property of the EPA and is loaned to your agency;
It and its contents are not to be distributed outside your agency.

United States Environmental Protection Agency  
Criminal Investigation Division  

0905-0043  
Case Number  

## Investigative Activity Report

jail....that "they" were after him and said "I'm being investigated." IGLECIAS recalled that BABAUTA said that they should not stay too long or be seen together or "they" might be watching him.

IGLECIAS acknowledged that despite the false reports that BABAUTA was submitting to the DEQ, the quality of the people's drinking water was never in danger because to the best of his knowledge, the CUC did respond properly. IGLECIAS said that if a "positive" hit for Total coliform or E-coli was being picked up at various sample points around the island, that as far as he knew the Water Division was being alerted and the water was being properly treated/chlorinated. IGLECIAS said that if the contaminated points had not been treated properly, he could not have stayed quiet as he would have felt very guilty and ashamed if he knew this and did not speak up. IGLECIAS admitted that if in fact he had done as directed by BABAUTA, and altered the raw data, he was very detail-oriented and would have spent "hours" doing a good job to hide their tracks. IGLECIAS stated that he was raised to be an honest man and could never do something like that and feel good about himself.

IGLECIAS recanted what he told this reporting Agent on August 5, 2003, that he realized that he should have come forward sooner with this information and thus is prepared to suffer the consequences of his actions. IGLECIAS noted that he feels he is already feeling some of it per his current suspension. This in mind, IGLECIAS said he wished that he had revealed to the Board how BABAUTA had told him to lie to the Board as it may have had an effect on their decision to suspend him, then IGLECIAS added it could have been worse, they could have fired him.

IGLECIAS closed by speaking of his loyalty to his family and to the people of the CNMI and how he takes great pride in his job and the work he does to protect the quality of drinking water for the people of the CNMI. IGLECIAS stated....the "truth needs to be told."

<u>ATTACHMENT</u>

None.

This document contains neither recommendations nor conclusions of the EPA. It is the property of the EPA and is loaned to your agency; it and its contents are not to be distributed outside your agency.



# Commonwealth of the Northern Mariana Islands
## Division of Environmental Quality
P.O. Box 1304, Saipan, MP 96950

Tels.: (670) 664-8500/8501
Fax : (670) 664-8540

February 23, 2001

Via hand delivery

Timothy P. Villagomez
Executive Director
Commonwealth Utilities Corporation
P.O. Box 501220
Saipan, MP 96950

RE: **NOTICE OF VIOLATION and REQUEST FOR CORRECTIVE ACTION**
Commonwealth Utilities Corporation (PWS ID #MP0000001)
Violation of the Maximum Contaminant Level (MCL) for Microbiological
Contaminants, Repeat Sampling Procedures, Public Notification, and
Reporting Requirements.

Dear Mr. Villagomez:

The CNMI Drinking Water Regulations Section 5.3.1(a)(1) establishes a Maximum Contaminant Level (MCL) for microbiological contaminants of no more than 5.0 percent total coliform positive samples collected during a month. If a public water system (PWS) serves water to its consumers that exceeds this percentage, it is in violation of the CNMI Drinking Water Regulations. Based on the reports submitted from Commonwealth Utilities Corporation (CUC) to the Division of Environmental Quality (DEQ), in July 2000, CUC collected 104 samples and 9 samples were positive for total coliform (8.7%). In October 2000, 103 samples were collected with 6 positive for total coliform (5.8%). CUC is therefore in violation of the MCL for microbiological contaminants for the months of July and October.

Section 5.3.2(b)(1) of the CNMI Drinking Water Regulations states that if a routine sample is total coliform positive, the public water system must collect a set of repeat samples within 24 hours of learning the results. A system such as CUC must collect no fewer than three (3) repeat samples for every total coliform positive sample found. Repeat samples must be collected from the sampling tap where the original positive sample was taken, one repeat at a tap within five (5) service connections upstream and at least one repeat sample at a tap within five (5) service connections downstream of the original sampling tap. CUC did not collect the minimum required repeat samples for the month of July 2000. It is also not clear in the reports that repeat samples are being collected in the manner stated above.